UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RAUL ARELLANO, JR., CDCR #AH-1995 | Case No.: 15cv2247-JLS (JLB) |
| Plaintiff, | **ORDER: (1) DENYING PLAINTIFF'S MOTION FOR APPOINTMENT OF AN EXPERT; (2) DENYING PLAINTIFF'S MOTION FOR AN EXTENSION OF TIME TO OPPOSE SUMMARY JUDGMENT; AND (3) GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| v. DR. K. DEAN; NURSE S. PASHA, Defendants. | |
| | (ECF Nos. 77, 93, 103) |

Presently before the Court is Defendants Dr. Kristen Dean and Nurse Practitioner ("NP") Susan Pasha's Motion for Summary Judgment ("MSJ," ECF No. 77), Plaintiff's Motion for appointment of an expert (ECF No. 93), and Plaintiff's Motion for an extension of time to oppose summary judgment (ECF No. 103). For the following reasons, the Court **DENIES** Plaintiff's Motions and **GRANTS** Defendants' Motion.[1]

---

[1] Although this matter was randomly referred to United States Magistrate Judge Jill L. Burkhardt pursuant to 28 U.S.C. § 636(b)(1)(B), the Court has determined that neither a Report and Recommendation nor oral argument is necessary for the disposition of this matter. *See* S.D. Cal. Civ.L.R. 72.1(d).

Plaintiff Raul Arellano Jr. is a state prisoner proceeding pro se and *in forma pauperis* with a Second Amended Complaint ("SAC," ECF No. 11) pursuant to 42 U.S.C. § 1983. Plaintiff alleges that in 2012, while he was incarcerated at the R.J. Donovan Correctional Facility ("RJDCF") in San Diego, California, he had medical consultations with two RJDCF employees, Defendants Dr. Dean and NP Pasha, who were deliberately indifferent to his serious medical needs in violation of the Eighth Amendment by failing to alter or recommend alteration of his medication or make an emergency referral to a neurologist, and in refusing to prescribe him orthopedic shoes. *Id*. at 5–8.

## I.  Procedural Background

Plaintiff initiated this action by filing a Complaint on October 6, 2015, naming six Defendants.  ECF No. 1.  After the Complaint was dismissed for failure to state a claim, a First Amended Complaint was filed on April 29, 2016, adding a seventh Defendant.  ECF No. 7.  The First Amended Complaint was dismissed for failure to state a claim, and the SAC, the operative pleading in this action, was filed on October 31, 2016, naming the same seven Defendants.  On March 31, 2017, the Court dismissed two Defendants and directed service of the SAC on the five remaining Defendants, Dr. Dean, NP Pasha, S. Roberts, M. Glynn and J. Lewis.  ECF No. 16.

A Motion to Dismiss by the five remaining Defendants was granted in part and denied in part on March 12, 2018.  ECF No. 52.  The Court denied the Motion to Dismiss as to Defendants Dr. Dean and NP Pasha, and granted it as to Defendants S. Roberts, M. Glynn and J. Lewis.  *Id.*  Plaintiff was granted leave to file a Third Amended Complaint to re-allege his claims against Defendants S. Roberts, M. Glynn and J. Lewis, and was informed that if he failed to amend by April 23, 2018, this case would proceed on the SAC against Defendants Dr. Dean and NP Pasha only.  *Id.* at 10.  After that deadline passed without Plaintiff filing an amendment, Defendants Dr. Dean and NP Pasha filed an Answer to the SAC on May 15, 2018.  ECF No. 56.  Although Plaintiff was granted two extensions

///

of time to amend until September 17, 2018 (ECF Nos. 62, 69), he did not file a Third Amended Complaint.

Defendants Dr. Dean and NP Pasha filed the instant Motion for Summary Judgment on January 10, 2019. *See generally* MSJ. Plaintiff filed an Opposition on February 27, 2019 ("Opp'n," ECF No. 90). Defendants filed a Reply on March 1, 2019 ("Reply," ECF No. 91), and Plaintiff filed a Sur-Reply on March 13, 2019 ("Sur-Reply," ECF No. 98). Plaintiff filed a Motion for appointment of an expert on February 28, 2019, (ECF No. 93) arguing he needs an expert to challenge the opinion of Defendants' expert that orthopedic shoes are not medically appropriate for his condition. Finally, on May 13, 2019, he filed a Motion for an Extension of Time (ECF No. 103) to respond to the summary judgment motion, arguing he needs time to gather evidence to refute Defendants' position that his seizures are undocumented.

## II. Plaintiff's Allegations

Plaintiff alleges in the SAC that he suffers from seizures due to a 2010 head trauma, that he has severe head and lower back pain due to that trauma and a 2012 incident where he fell from a top bunk, and that he has diabetic neuropathy. SAC at 5. In 2011, while housed at Calipatria State Prison, he was prescribed Neurontin (a brand name for the drug gabapentin) to control his seizures and nerve pain.[2] *Id.* at 5, 17–19. In 2012 he was transferred to RJDCF, after which Neurontin was discontinued and he was prescribed Keppra (a brand name for the drug levetiracetam) for seizures and Elavil (a brand name for the drug amitriptyline) for pain. *Id.* at 5.

### A. *Allegations against Defendant Dr. Dean*

Plaintiff alleges he was seen by Defendant Dr. Dean at RJDCF on May 20, 2014. *Id.* at 5. During this visit, Plaintiff alleges he informed Dr. Dean that his medication had been changed from Neurontin to Keppra and Elavil when he was transferred to RJDCF in

---

[2] The brand names and pharmaceutical names of Plaintiff's medications are used interchangeably throughout his pleadings and prison medical records.

2012, but that it was ineffective and causing life-threatening side effects. *Id.* Plaintiff further states he told Dr. Dean he had previously been prescribed Keppra and Elavil in 2011, but they "were taken away due to its side effects putting my health and life at risk, and for being ineffective to my medical necessity issue." *Id.* at 5–6.

Plaintiff contends his prison medical history was available to Defendant Dr. Dean, which showed he was on Neurontin, Keppra and Elavil in May 2011, that by September-December 2011 he was taken off Keppra and remained on Neurontin, but Neurontin was removed "for no reasonable reasons in 2012 and was not substituted with an effective appropriate medication." *Id.* at 7. He alleges Defendant Dr. Dean should have known his medical records show Neurontin is the best and most effective medication to control his seizures and pain without severe side effects. *Id.* Plaintiff claims he was not "specifically asking for Neurontin, I was open for anything else . . . effective to [treat] my seizures and nerve pain without severe side effects." *Id.* at 6–7.

Plaintiff alleges he reported the following side effects from Keppra and Elavil to Defendant Dr. Dean during their visit:

> (1) can't sleep due to pain; (2) can't sleep due to panic attacks; (3) pain severe that interferes with breathing; (4) pain severe that has been giving me suicidal thoughts, as I attempted suicide; (5) seizures are aggressive, uncontrol[led], due to Keppra medication, putting health & life at risk; (6) life & health at risk because side effects causes nausea that makes me vomit, and it causes dizziness that causes me to fall.

*Id.* at 5. He states that when he informed Defendant Dr. Dean that his current medication was causing him to have suicidal thoughts, she responded with a "laugh" and said: "Don't tell no one that, just do it." *Id.* at 8.

Plaintiff alleges he told Defendant Dr. Dean that a high percentage of his pain was reduced when wearing orthopedic shoes borrowed from other inmates, and that he "was asking for [the] institution to prescribe [him] orthopedic shoes so [his] severe pain can be reduce[d] as how other similar situated inmates['] pain have been reduced after [the] institution has prescribed them orthopedic shoes." *Id.* Although Defendant Dr. Dean

4

doubled the dosage of his pain medication Elavil, she did not replace Keppra and Elavil with another medication, and allegedly told him "she wasn't ordering [orthopedic shoes] because they cost money to the institution." *Id.* at 6, 10.

### B. *Allegations against Defendant NP Pasha*

Plaintiff alleges Defendant NP Pasha, a nurse at RJDCF, "is liable under the same facts as stated on [sic] K. Dean. The only difference is that Pasha saw me 2 weeks or 3 weeks after K. Dean." *Id.* at 8. Plaintiff states that when he was seen by Defendant NP Pasha on June 10, 2014, he provided her with the same information he provided Defendant Dr. Dean regarding his medications and medical history. *Id.* He allegedly told Defendant NP Pasha that Defendant Dr. Dean was wrong to ignore his serious medical needs, that he told Defendant NP Pasha she was leaving him to live without being "able to sleep, eat, walk, exercise, etc.," and that Defendant NP Pasha acknowledged she knew she was leaving him to live with those conditions "but because it is not her [i]n [Plaintiff's] shoes she d[id]n't care." *Id.* Plaintiff claims Defendant NP Pasha was deliberately indifferent to his serious medical needs because she "ignored a serious medical condition" for "no reasonable reason." *Id.*

Plaintiff alleges he was taken off Keppra and Elavil by doctors at RJDCF as a result of a suicide attempt in March 2015, after which he ended "up in suicidal infirmary due to side effects of this [sic] pills, and due to severe pain." *Id.* at 7. He was prescribed Lyrica for pain in October 2015, and by December 2015 had once again been prescribed Neurontin for seizures and pain. *Id.*

## II. Defendants' evidence in support of Motion for Summary Judgment

### A. *Dr. Dean Declaration*

Defendant Dr. Dean has presented an affidavit stating that she worked at RJDCF from April 2014 through July 2015 as a contract physician two to three days per week and was never the regular primary care physician for Plaintiff or any other patient at RJDCF. Declaration of Dr. Kristin Dean in Support of Defendants' Motion for Summary Judgment ("Dr. Dean Decl.") ¶ 3, ECF No. 77-2. While working at RJDCF it was her habit and

practice to document all requests and concerns made by patients during their visits, including requests for treatment and medication or concerns with existing medication. *Id.* ¶ 5. Her notes indicate she had a consultation with Plaintiff on May 21, 2014, not May 20, 2014 as alleged by Plaintiff, and show he complained of a "needle" sensation in his feet, back pain, and numbness in his arms, but do not show a request for Neurontin or orthopedic shoes, or that he reported concerns with side effects of his medication. *Id.*

Defendant Dr. Dean also states it is her habit and practice to document any suicidal thoughts expressed by any patient and immediately refer any patient who expresses active suicidal thoughts to the Triage and Treatment Area for evaluation and potential initiation of a psychiatric hold as required by the policies and procedures at RJDCF. *Id.* ¶ 6. Because her treatment notes do not show Plaintiff expressed suicidal thoughts to her, she states: "I believe he did not express any suicidal thoughts to me," and that "I have certainly never in my career told a patient expressing suicidal thoughts to 'just do it,' or any other words to that effect." *Id.*

Defendant Dr. Dean states further that while she was working at RJDCF she was not authorized to prescribe Neurontin to an inmate. *Id.* ¶ 7. Neurontin could only be prescribed by a primary care physician because the California Department of Corrections and Rehabilitation ("CDCR") placed a special restriction on it due to concerns about its potential for dependence and abuse. *Id.* She states that if a prisoner requested Neurontin from her, she would have referred the prisoner to a neurologist for further evaluation as required by the policies and procedures of the CDCR and RJDCF. *Id.*

Regarding the prescription for Elavil, Defendant Dr. Dean states that it is commonly prescribed to treat diabetic neuropathy and, based on her review of her notes of their May 21, 2014 visit, she raised the dosage of Elavil from 25 to 50 mg in response to Plaintiff's complaint of neuropathic pain. *Id.* ¶ 8. She states it was medically appropriate for Plaintiff to be prescribed Elavil at that dosage and that Keppra is commonly prescribed to control seizures and was medically appropriate for Plaintiff. *Id.*

///

Finally, Defendant Dr. Dean states Plaintiff reported at that time that his last seizure was in 2012, which was an indication his current medication was successfully controlling his seizures and that there was no indication of a need to change that medication; based on this information, she "ordered a level for the [Keppra] to ensure the medication was within an appropriate range in [Plaintiff]'s blood." *Id.* ¶ 9.

### B. Dr. Bennet Feinberg Declaration

Defendants have also attached the declaration of Dr. Bennett Feinberg, who states he is board certified in internal medicine with more than 20 years of experience in the field. Declaration of Dr. Bennet Feinberg in Support of Defendants' Motion for Summary Judgment ("Dr. Feinberg Decl.") ¶ 2, ECF No. 77-3. Dr. Feinberg is familiar with the policies and procedures regarding access to medical care within the prisons and facilities of the CDCR, having worked as a full-time primary care physician at Folsom State Prison and Mule Creek State Prison from January 2010 through January 2017. *Id.* ¶ 4.

Dr. Feinberg reviewed Plaintiff's Unit Health Record ("UHR") from August 1, 2011 through May 23, 2017, which documents the medical care he received. *Id.* ¶¶ 5–6. Dr. Feinberg states Plaintiff's UHR shows that he had a consultation with a neurologist, Dr. Straga, on August 23, 2011, shortly after Plaintiff arrived at Calipatria State Prison, that Dr. Straga noted Plaintiff had recently arrived from San Diego County Jail taking the seizure medications Neurontin, Keppra and Dilantin, and that Plaintiff reported he developed seizures after being hit in the head with a baseball bat in Mexico in September 2010. *Id.* ¶ 10. Dr. Straga recommended an EEG and an MRI, and that Plaintiff taper off Dilantin and continue taking Neurontin and Keppra "for now." *Id.* Plaintiff's UHR indicate he had a follow-up visit with Dr. Straga on October 5, 2011, who noted that the MRI of his brain was normal and recommended continuing Keppra, gradually starting Lamictal, and discontinuing Neurontin after two weeks. *Id.* ¶ 11.

Plaintiff was seen by Dr. Noonan, a Primary Care Provider ("PCP") on October 14, 2011. *Id.* ¶ 12. The notes of that visit indicate that the notes from Plaintiff's previous visit with Dr. Straga were not available, that Plaintiff informed Dr. Noonan that Dr. Straga had

15cv2247-JLS (JLB)

recommended a change in the Neurontin prescription, and that Dr. Noonan noted he planned to obtain Dr. Straga's notes and order a change in Plaintiff's medication accordingly. *Id.* On October 17, 2011, Dr. Noonan signed a Medication Reconciliation directing the pharmacy to stop Neurontin in two weeks and begin Lamictal. *Id.* ¶ 12.

On December 15, 2011, Plaintiff had a PCP visit with Nurse Practitioner Joshua Burgett following his transfer to RJDCF. *Id.* ¶ 14. The notes of that visit indicate Plaintiff "agrees then refuses Keppra," was "focused on Neurontin," and "Burgett's plan is to decrease Keppra and start Depakote, a different seizure medication." *Id.* Plaintiff underwent an EEG at Tri-City Medical Center on February 29, 2012, where Dr. Paduga noted his EEG and prior MRI were both normal. *Id.* ¶ 15.

Plaintiff's UHR indicates he had a visit with Defendant Dr. Dean on May 21, 2014, who noted she reviewed his chronic medical conditions with him and Plaintiff reported he had not had a seizure in two years. *Id.* ¶ 16. The notes do not indicate Plaintiff raised any concerns with his medication and show his primary complaint was back pain attributable to a fall, for which Defendant Dr. Dean prescribed Tylenol, ordered x-rays, and referred him to physical therapy depending on the outcome of the x-rays. *Id.* She also noted Plaintiff complained of a "needle" sensation on the bottoms of his feet, which, after examining his feet, she noted an impression that it was due to neuropathy secondary to his type 2 diabetes mellitus and increased the dosage of his pain medication Elavil. *Id.* She also referred him for an eye examination due to his diabetes and ordered a blood test to determine his Keppra level, but her notes for that visit do not contain any mention of a request for orthopedic footwear. *Id.*

Dr. Feinberg states Plaintiff's UHR shows his visit with Defendant NP Pasha on June 10, 2014, was precipitated by an inmate grievance related to "access to care [and] pain management for his low back pain." *Id.* ¶ 17. Defendant NP Pasha noted Plaintiff had previously addressed that issue with Defendant Dr. Dean on May 21, 2014, where his Elavil dosage had been increased. *Id.* The notes indicate Plaintiff reported his most recent seizure was three months ago, that his "low back pain has improved," and that Plaintiff agreed with

his treatment plan. *Id.* There is no reference to a request for Neurontin or orthopedic footwear. *Id.*

On July 22, 2014, Plaintiff had a PCP visit with Dr. Chau as a follow-up to his visits with Defendants Dr. Dean and NP Pasha. *Id.* ¶ 18. The notes indicate Plaintiff did not have any specific complaints at that time and that Dr. Chau recommended increasing the dosage of Keppra, but Plaintiff refused and requested to remain on the same dosage. *Id.*

At a visit with Dr. Chau on August 7, 2014, following a complaint he suffered from seizures and was not being provided his medication in the pill line, Dr. Chau increased the dosage of Keppra and noted Plaintiff requested Neurontin but denied any side effects from Keppra. *Id.* ¶ 19. Dr. Chau noted there were no witnesses to Plaintiff's seizures and he had not reported to the Triage and Treatment Area following his seizures, which is available in each CDCR facility and functions as an urgent care setting for inmates. *Id.*

Plaintiff's UHR shows he had a PCP visit with Dr. Chau on August 22, 2014, precipitated by an inmate grievance requesting Neurontin and monetary compensation for his treatment in the pill line. *Id.* ¶ 20. Dr. Chau conducted a full musculoskeletal and neurological examination with unremarkable results and noted that, although Plaintiff reported he had another seizure in the two weeks since Dr. Chau had increased his Keppra medication, he once again "did not report to the [Triage and Treatment Area] as directed." *Id.* The UHR indicates Plaintiff reported to Dr. Chau during that visit that he had been compliant in taking Keppra and denied any side effects, and that Dr. Chau planned to check the level of Keppra in his blood and refer him to a neurologist for evaluation. *Id.* Dr. Chau noted that although Plaintiff was prescribed Elavil for pain, it was not detected in his blood and "[t]here is a questionable adherence to medication." *Id.*

Dr. Feinberg states Plaintiff's UHR shows that on November 4, 2014, he had a Telemedicine Neurology Initial Consultation with Dr. Malhotra, a neurologist, who noted he thoroughly reviewed Plaintiff's medical records and took a history from him. *Id.* ¶ 21. Dr. Malhotra's impression was "[p]resumed seizures but there is no objective support and convincing eyewitness accounts." *Id.* He also reported Plaintiff "wants" Neurontin but

continued him on the existing dosage of Keppra. *Id.* Plaintiff had a Telemedicine Neurology follow-up visit with Dr. Malhotra on January 5, 2015, during which he reported he had a seizure on December 20, 2014, but once again did not notify staff at that time. *Id.* ¶ 22. Dr. Malhotra recommended continuing the same dosage of Keppra. *Id.*

On January 6, 2016, Plaintiff had a PCP visit with Dr. Luu, who noted Plaintiff requested pain medication. *Id.* ¶ 23. Plaintiff at that time was on Lyrica, a gabapentinoid in the same family as Neurontin, and Sulindac, a nonsteroidal anti-inflammatory drug which had been prescribed for pain relief and as an anti-inflammatory. *Id.* Dr. Luu changed the Lyrica prescription to Neurontin and continued the Sulindac prescription. *Id.* On January 14, 2016, Plaintiff had a Telemedicine follow-up visit with Dr. Malhotra, who noted that since his last neurology visit a year earlier Plaintiff's Keppra prescription had been stopped due to reported side effects and Neurontin had recently been added but stated: "I see no indication for Neurontin." *Id.* ¶ 24.

Based on this information, Dr. Feinberg opines it was medically appropriate for Defendant Dr. Dean to maintain Plaintiff's existing Keppra prescription and increase the dosage of Elavil, observing there is nothing in Plaintiff's UHR to support his allegation he voiced concerns with Keppra or Elavil at that visit or requested Neurontin in their place. *Id.* ¶ 25. Dr. Feinberg further states that even assuming Plaintiff raised those issues at that time, it was medically appropriate for Defendant Dr. Dean to keep him on Keppra and Elavil. *Id.* It would have been medically inappropriate, according to Dr. Feinberg, for Dr. Dean to prescribe Neurontin, because: (1) a neurologist (Dr. Straga) recommended on October 5, 2011, that Plaintiff should discontinue Neurontin and continue Keppra; (2) Plaintiff reported to Defendant Dr. Dean that his last seizure was two years earlier, an indication Keppra was successfully controlling his seizures; and (3) Plaintiff subsequently requested Neurontin in place of Keppra from two primary care physicians, Dr. Malhotra, a neurologist, and Dr. Chau, who both denied his requests and continued him on Keppra. *Id.*

Dr. Feinberg states that because Elavil is recommended as the first-line treatment for chronic neuropathic pain in many guidelines, with 25 mg on the low end of the effective

range for neuropathic pain, it is his opinion it was medically appropriate for Defendant Dr. Dean to have increased Plaintiff's dosage of Elavil from 25 mg to 50 mg at their May 21, 2014 visit. *Id.* ¶ 26. "It would have been medically inappropriate to replace [Elavil] with Neurontin. *Id.*

Dr. Feinberg observes that Plaintiff's UHR does not show he requested orthopedic shoes from Defendant Dr. Dean on May 21, 2014. *Id.* ¶ 27. Even if he had requested them, however, Dr. Feinberg believes it would have been medically inappropriate for Dr. Dean to provide them because: (1) the medical purpose of orthopedic shoes in persons with peripheral neuropathy is to decrease the chance of developing a foot ulcer; (2) Plaintiff has never been diagnosed with a foot ulcer or pre-ulcerative callus, has no history of partial or complete foot amputation or any type of foot deformity to predispose him to such ulcers, and is not documented as having a diminished blood supply to the foot that would place him at a risk for a foot ulcer; and (3) orthopedic shoes are not intended or expected to reduce neuropathic pain. *Id.*

Finally, Dr. Feinberg observes that Plaintiff's UHR does not support his allegation that at his June 10, 2014, visit with Defendant NP Pasha, he requested Neurontin, complained of negative side effects of Keppra or Elavil, or requested orthopedic shoes. *Id.* ¶ 28. But even assuming he did, it would have been medically appropriate for Defendant NP Pasha to refuse Neurontin and continue Keppra and Elavil because they were medically appropriate to treat his seizures and neuropathic pain, while Neurontin was not indicated. *Id.* It also would have been medically inappropriate to prescribe orthopedic shoes because there was no medical need for them. *Id.*

## III.  Plaintiff's Evidence in Opposition to Summary Judgment[3]

Plaintiff states in his Opposition that on: "11-15-2011 I was transferred to R.J. Donovan Prison. I didn't see no Neurologist but did s[ee] many doctors. To all this [sic]

---

[3] Plaintiff's Opposition is signed under penalty of perjury, as is his SAC, and to the extent the allegations contained therein are within his personal knowledge, they are treated as affidavits in opposition to the summary judgment motion. *Schroeder v. McDonald*, 55 F.3d 454, 460 & nn.10–11 (9th Cir. 1995).

doctors I mention to them how Dilantin, Keppra, Elavil keep on giving me severe side effects. An[d] that the only medication I previously tried and it didn't give me side effects plus I felt it was very effective to my type of pain is Neurontin. I also explain[ed] how while [o]n Neurontin (600 mg) I felt I had less . . . severe seizures." Opp'n at 2. He alleges he did not specifically request Defendants prescribe Neurontin but was simply requesting a change from his "ineffective poisonous medications." *Id.*

Plaintiff argues the evidence presented in this case shows Neurontin is the best medication to control his seizures and neuropathic pain without side effects. *Id.* He argues this is supported by the fact that Dr. Straga initially left him on Neurontin and Keppra on August 23, 2011 and that when Dr. Straga took him off Neurontin after a seizure on September 28, 2011, Dr. Straga told him at that time his medications might need adjusting. *Id.* Plaintiff was then transferred to RJDCF where he alleges he told Defendant Dr. Dean the new course of medication was causing intolerable side effects. *Id.* at 3, 6–7. Plaintiff further argues he consistently complained to doctors directly and through the administrative grievance process that Elavil and Keppra had negative side effects and did not treat his pain, seizures, or diabetes as well as Neurontin had prior to his transfer to RJDCF; indeed, Plaintiff argues that it took a suicide attempt in March 2015 to be taken off Keppra and Elavil and eventually prescribed Lyrica in October 2015, and Neurontin in December 2015. *Id.* at 3–4, 7–8; SAC at 7.

Plaintiff disagrees with Dr. Feinberg's opinion that Defendant Dr. Dean was not deliberately indifferent in continuing Keppra and increasing Elavil. Opp'n at 5. According to Plaintiff, even assuming Keppra is an effective anti-seizure medication, he told Defendant Dr. Dean that Keppra caused him side effects that he had not experienced with Neurontin and he also told her Elavil was ineffective for his pain. *Id.* He argues Defendant Dr. Dean could have, but did not: return him to Neurontin; prescribe a different course of medication by discontinuing Elavil and prescribing Lyrica or other pain medication; refer him to a neurologist or primary care doctor; document his complaints; or "stop my current ///

medication and start me [on] a new course of treatment that didn't need to be Neurontin." *Id.*; *see also id.* at 9.

Plaintiff disagrees with Dr. Feinberg's opinion that Neurontin was not a medically acceptable treatment, pointing out that it had been approved by the CDCR and prescribed to him prior to his transfer to RJDCF. *Id.* at 5–7. He disagrees with Dr. Feinberg that the fact that Dr. Malhotra, a neurologist, and Dr. Chau both left him on Keppra and Elavil at follow-up visits to his visit with Defendants supports a finding they followed an appropriate course of treatment, contending that: "Dr. Chau was also deliberate indifferen[t] by him making false documentation of his notes when I s[aw] him." *Id.* at 7. Plaintiff alleges that Dr. Chau, like Defendants, falsely reported in the notes of their visit that he did not complain about the side effects of Keppra and Elavil or that they were ineffective. *Id.* Plaintiff states that his inmate grievances around the time of that meeting show he was making such complaints. *Id.* He claims his meeting with Dr. Malhotra after he saw Defendant Dr. Dean was only to determine if Keppra was an appropriate seizure medication, which was the only reason Dr. Chau referred him to Dr. Malhotra, and that Dr. Malhotra was also deliberately indifferent by leaving him on Keppra, despite Plaintiff telling him that Neurontin did not cause side effects. *Id.* at 7–8.

Plaintiff addresses Defendant Dr. Dean's statement that she did not have the authority to prescribe Neurontin by stating: "I understand such procedures but what [D]efendant seems to ignore is that when a patient brings to the attention of a doctor that current medication is giving him side effects sufficient to meet the objective standard of [the] 8th Amendment, it's for the current doctor to do what's necessary." *Id.*

## III. Additional Briefing

### A. *Defendants' Reply*

Defendants respond to Plaintiff's Opposition by pointing out it focuses on the failure of Defendants Dr. Dean and NP Pasha to prescribe Neurontin as the best treatment for his medical condition. Reply at 3. Such a disagreement over medical treatment does not show deliberate indifference, particularly because he has not shown he received medically

13

unacceptable treatment. *Id.* 3–7. Defendants argue Plaintiff has failed to produce evidence supporting his allegations that he raised his concerns about his medications with Defendants or requested Neurontin or orthopedic shoes from them. *Id.* at 4–5. Defendants argue further that they are entitled to qualified immunity because there is no clearly established federal right requiring a physician or nurse practitioner to prescribe a specific drug or orthopedic shoes when requested by a prisoner rather than providing a medically acceptable alternative course of treatment. *Id.* at 8–9.

### B. Plaintiff's Sur-Reply

Plaintiff filed a response to Defendants' Reply, in which he argues that his verified pleadings provide sufficient evidence for the purpose of the instant motion to support his allegations that he informed Defendants of his medical complaints, despite the fact that Defendants have provided affidavits stating otherwise. Sur Reply at 1–4. Plaintiff argues the Court is not entitled to weigh the credibility of witnesses on a motion for summary judgment and it is for a jury to decide whether he reported his concerns to Defendants and they failed to document them. *Id.* He argues he has presented evidence showing he was provided with a medically unacceptable course of treatment by his consistent reporting that his medications were ineffective and causing side effects which put his life and health at risk. *Id.* at 2–3.

## LEGAL STANDARD

Defendants are entitled to summary judgment if they show "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Entry of summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

///

The moving party has the initial burden of showing summary judgment is proper "by showing the absence of a genuine issue as to any material fact." *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). In order to avoid summary judgment, the nonmovant must present "specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). The Court may not weigh evidence or make credibility determinations, and any inferences drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party. *Id*. at 255. The nonmovant's evidence need only be such that a "jury might return a verdict in his favor." *Id*. at 257.

The Eighth Amendment's cruel and unusual punishments clause is violated when prison officials are deliberately indifferent to a prisoner's serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 102–05 (1976). To establish deliberate indifference, Plaintiff must point to evidence in the record from which a trier of fact might reasonably conclude that the treatment he received from Defendants placed him at risk of "objectively, sufficiently serious" harm, and that Defendants had a "sufficiently culpable state of mind" when they provided or denied medical care. *Wallis v. Baldwin*, 70 F.3d 1074, 1076 (9th Cir. 1995).

In order to show the prison officials were deliberately indifferent to a substantial risk of harm, Plaintiff must show "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of the facts from which the inference could be drawn that substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Inadequate medical treatment, medical malpractice, or even gross negligence by itself does not rise to that level, as "the Eighth Amendment proscribes 'the unnecessary and wanton infliction of pain,' which includes those sanctions that are 'so totally without penological justification that it results in the gratuitous infliction of suffering.'" *Hoptowit v. Ray*, 682 F.2d 1237, 1246 (9th Cir. 1982), *overruled on other grounds by Sandin v. Conner*, 515 U.S. 472 (1995) (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)).

///

///

Both Defendants move for summary judgment. Defendant Dr. Dean argues that Plaintiff's allegations regarding what he reported to her contradicts her treatment notes from their visit and, because he was provided medically appropriate care for all his serious medical needs, his allegations point at most to a dispute over the nature of treatment, not a deliberate indifference to his serious medical needs. MSJ at 13–14.

Defendant NP Pasha argues Plaintiff is attempting to hold her liable for his complaints against Defendant Dr. Dean and his claims against her fail for the same reasons they fail against Defendant Dr. Dean. *Id.* at 19–20. Both Defendants claim there is no evidence they caused any harm to Plaintiff because they were legally unable to prescribe Neurontin and could only have recommended it to his primary care providers, both of whom denied his requests for that medication at follow-up appointments several weeks later. *Id.* at 17–18.

Defendants also claim they are entitled to qualified immunity. They argue Plaintiff cannot show they violated a clearly established constitutional right because there are no medical authorities establishing the course of medical care he was provided is medically unacceptable or the alternate treatments he requested are constitutionally required under the circumstances. *Id.* at 20–22.

In addition to his Opposition and Sur-Reply, Plaintiff also filed several motions and an objection to Defendants' evidence submitted. The Court will address Plaintiff's requests first, then move to the discussion pertaining to the Motion for Summary Judgment.

## I.    Plaintiff's Motions and Objection

Plaintiff has filed an objection to allowing Dr. Feinberg to testify as an expert witness at trial, which the Court will liberally construe as an objection to the use of his testimony in support of summary judgment. ECF No. 74. Plaintiff argues Dr. Feinberg "is no expert in any of the medications in question," and is not an expert on seizure disorders, low back pain or neuropathy. *Id*. at 1. He also argues Dr. Feinberg is not impartial because he worked for, or does work, for the CDCR. *Id.* Further, an expert should only testify where

their testimony is necessarily or significantly useful to the trier of fact to comprehend a material issue in dispute, which according to Plaintiff, does not apply here. *Id.* Finally, Plaintiff challenges the specific opinions, conclusions and observations that Dr. Feinberg has drawn from his review of Plaintiff's UHR, although in doing so he refers to a declaration by Dr. Feinberg which has not been presented in this case.[4] *Id*. at 3–9. With respect to Dr. Feinberg's opinion regarding orthopedic shoes, Plaintiff argues that Dr. Feinberg does not have expertise in that field. After reviewing Plaintiff's objections and Dr. Feinberg's report, the Court finds the opinions offered by Defendants' expert to be reliable and helpful for the trier of fact. The Court therefore **OVERRULES** Plaintiff's objections.

Plaintiff has also filed a Motion for an Extension of Time to Oppose Summary Judgment (ECF No. 103). Plaintiff argues he needs time to collect evidence to refute Defendants' contention that his seizures have not been documented because was unaware it would be at issue. *Id.* Based on the record already before the Court, Plaintiff has no need to gather evidence to refute Defendants' observation that his seizures are not documented. His Motion for an extension of time to oppose summary judgment (ECF No. 103) is therefore **DENIED**.

Finally, Plaintiff requests appointment of an expert witness to show that a normal EEG is not proof a person does not have seizures, requests an extension of time to subpoena witnesses to his seizures, and contends county jail records support a finding that he has had seizures but needs counsel appointed to assist him in retrieving those records. ECF No. 93 at 1–3. Plaintiff has shown no need for appointment of an expert to challenge Defendants' contrary opinions, as the Court notes that such an opinion, even one that contradicts

///

---

[4] Plaintiff's Objection to Dr. Feinberg's testimony was filed nearly two months before the summary judgment motion, which appears to explain why it does not correlate with Dr. Feinberg's declaration. For example, he refers to page twelve of Dr. Feinberg's ten-page declaration. *Id*. at 6. He appears to be referring to a declaration by Dr. Feinberg in one of the several other civil rights cases Plaintiff is currently litigating in this Court.

15cv2247-JLS (JLB)

Defendants' experts' opinion, would not change the outcome of the current motion. Plaintiff's Motion for appointment of an expert (ECF No. 93) is therefore **DENIED**.

## II. Defendants' Motion for Summary Judgment

As set forth above, an Eighth Amendment deliberate indifference claim requires Plaintiff to establish that Defendants knew of and disregarded "an excessive risk to inmate health or safety," which requires that Defendants "both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [they] must also draw the inference." *Farmer*, 511 U.S. at 837. Plaintiff must also show Defendants' deliberate indifference caused him harm. *Jett v. Palmer*, 439 F.3d 1091, 1096 (9th Cir. 2006). The harm need not be substantial, but if the harm is an "isolated exception" to his "overall treatment," it "ordinarily militates against a finding of deliberate indifference." *Id.* Although medical malpractice does not constitute cruel and unusual punishment, *Estelle*, 429 U.S. at 106, and a mere delay of medical treatment, without more, is insufficient, *Shapley v. Nevada Bd. of State Prison Comm'rs.*, 766 F.2d 404, 407 (9th Cir. 1985), it is possible for prison officials to be deliberately indifferent to a prisoner's serious medical needs if they "deny, delay or intentionally interfere with medical treatment." *Hunt v. Dental Dep't*, 865 F.2d 198, 201 (9th Cir. 1989). Indeed, "the Eighth Amendment proscribes the 'unnecessary and wanton infliction of pain,' which includes those sanctions that are 'so totally without penological justification that it results in the gratuitous infliction of suffering.'" *Hoptowit*, 682 F.2d at 1246 (quoting *Gregg*, 428 U.S. at 173).

For the following reasons, the Court finds Plaintiff has failed "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. The Court finds Plaintiff's claims arise from a difference in medical opinion about the best course of action which does not give rise to an Eighth Amendment violation. *See Snow v. McDaniel*, 681 F.3d 978, 987 (9th Cir. 2012). Plaintiff has also not established the existence of a genuine issue of material fact as to the essential elements of his Eighth Amendment deliberate indifference claims: that Defendants were aware of facts from

which they could draw an inference there was a substantial risk of serious harm if they did not immediately alter, or recommend alteration, his prescribed medication, refer him to a neurologist, or prescribe orthopedic shoes, nor that they actually drew such an inference; and their actions were "so totally without penological justification that it result[ed] in the gratuitous infliction of suffering" or otherwise caused him harm. Defendants are therefore entitled to summary judgment.

### A.    *Deliberate Indifference Claims Regarding Medication*

There are competing affidavits regarding what Plaintiff told Defendants regarding his medication and the Court will not weigh evidence or make credibility determinations. *Anderson*, 477 U.S. at 255. The Court will assume for the purposes of this Motion that a jury could find that Plaintiff informed Defendant Dr. Dean on May 20 or 21, 2014, and Defendant NP Pasha on June 10, 2014, or that they knew or should have known from a review of his UHR, that: he suffers from seizures caused by a 2010 head trauma; he suffers from pain resulting from that trauma, from nerve damage from a 2012 fall, and from diabetic neuropathy; he had tried several types of medication and Neurontin was the most effective to treat those conditions; he entered the CDCR in August 2011 with a prescription for Neurontin but was taken off Neurontin by Dr. Straga after a seizure on September 28, 2011, and placed on Keppra and Elavil in October 2011, at which time Dr. Straga told him his medications might need further adjusting; Keppra and Elavil were discontinued shortly thereafter in late 2011 when he had a seizure and he was returned to Neurontin; and, Neurontin was once again discontinued and replaced with Keppra and Elavil when he was transferred to RJDCF in early 2012.

Even assuming Defendants knew this information, the Court finds that, at most, Plaintiff's claims amount to a difference in medical opinion. Plaintiff does not dispute that Defendants Dr. Dean and NP Pasha were not authorized to prescribe Neurontin, and does not dispute that the CDCR's regulation of Neurontin due to its potential for dependence and abuse is unwarranted or the result of deliberate indifference, merely stating: "I understand such procedures but what defendant seems to ignore is that when a patient

brings to the attention of a doctor that current medication is giving him side effects sufficient to meet the objective standard of [the] 8th Amendment, it's for the current doctor to do what's necessary." Opp'n at 8. Further, he argues he was not "specifically asking for Neurontin, I was open for anything else . . . effective to my seizures and nerve pain without severe side effects." SAC at 6–7. He does not, however, identify what, other than Neurontin and Lyrica, that medication would be, as he appears to contend his complaints to Defendants were only satisfied when he was finally prescribed Lyrica and Neurontin in late 2015. *Id.* at 7; Opp'n at 8. He presents no evidence there exists an alternative medical regime available to treat his medical conditions other than Neurontin and Lyrica.

In contrast, Dr. Feinberg states it was medically appropriate for Defendants to keep Plaintiff on Keppra and Elavil, and it would have been medically inappropriate for Defendant Dr. Dean to prescribe Neurontin under the circumstances, because: (1) Dr. Straga, a neurologist, recommended on October 5, 2011 that Plaintiff should discontinue Neurontin and continue Keppra; (2) Plaintiff reported to Defendant Dr. Dean that his last seizure was two years earlier, an indication Keppra was successfully controlling his seizures; and (3) Plaintiff subsequently requested Neurontin in place of Keppra from two of his primary care physicians, Dr. Malhotra, a neurologist, and Dr. Chau, who both denied his request and continued him on Keppra. Feinberg Decl. ¶ 25.

Although Plaintiff disputes the accuracy of his UHR regarding what he reported to the doctors, he does not dispute that Dr. Straga, a neurologist, recommended that he discontinue Neurontin and continue Keppra on October 5, 2011. Although Keppra was briefly changed back to Neurontin when he had a seizure in late 2011, it was changed back again in early 2012 shortly after that change. He admits he informed Defendants of those facts during his 2014 visits and admits his medication had been changed to its current type and dosage in early 2012, nearly two years before he saw Defendants. Even considered in the light most favorable to Plaintiff, the Court finds these claims amount to difference of opinion regarding medical care, or at most an allegation of inadequate treatment, not a purposeful delay or refusal of medical care causing the unnecessary and wanton infliction

of pain. *Jackson*, 90 F.3d at 332 ("[W]here a defendant has based his actions on a medical judgment that either of two alternative courses of treatment would be medically acceptable under the circumstances, plaintiff has failed to show deliberate indifference, as a matter of law."); *McGuckin v. Smith*, 974 F.2d 1050, 1060 (9th Cir. 1992) (holding that with respect to denial or delay of prison medical care, "[a] defendant must purposefully ignore or fail to respond to a prisoner's pain or possible medical need in order for deliberate indifference to be established"), *overruled on other grounds by WMX Techs., Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997) (en banc); *Hoptowit*, 682 F.2d at 1246 ("[T]he Eighth Amendment proscribes the 'unnecessary and wanton infliction of pain,' which includes those sanctions that are 'so totally without penological justification that it results in the gratuitous infliction of suffering.'") (quoting *Gregg*, 428 U.S. at 173). The fact that his visits with Defendants were in the middle of a three-year period where his doctors consistently denied his requests for a change in medication supports this conclusion. *See Jett*, 439 F.3d at 1096 ("If the harm is an 'isolated exception' to the defendant's 'overall treatment of the prisoner [it] ordinarily militates against a finding of deliberate indifference.'") (quoting *McGuckin*, 974 F.2d at 1060).

Even assuming that Plaintiff has presented evidence from which a jury could find "that the course of treatment the doctors chose was medically unacceptable under the circumstances," *Jackson*, 90 F.3d at 332, there is still no genuine issue of material fact in dispute that either Defendant refused the change in medication "in conscious disregard of an excessive risk to plaintiff's health." *See id.* (citing *Farmer*, 511 U.S. at 836). Rather, Plaintiff's evidence points only to a difference of opinion with Defendants as to which medication was appropriate, and as such does not show deliberate indifference. The evidence that supports this includes that (1) Plaintiff's request to Defendants was for a change in medication back to the medication he was on in late 2011, which itself had been changed to his current medication and back again twice in the two and one-half years before his visits with Defendants, and (2) both the primary care doctor and the neurologist he saw in follow-up visits shortly after his visits with Defendants also refused the same request for

a change in medication. *See Toguchi v. Chung*, 391 F.3d 1051, 1058 (9th Cir. 2004) (finding claim that "Seroquel is superior to Triafon, and therefore should not have been discontinued," amounted to a "difference of medical opinion" which is "insufficient, as a matter of law, to establish deliberate indifference") (quoting *Jackson*, 90 F.3d at 332). And if Defendants had recommended that Plaintiff's primary care physicians change Plaintiff's medication to his preferred regimen, and they refused to do so, there would still be no deliberate indifference by Defendants. *See Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1969) (holding that where a physician recommended surgery but subsequent treating physicians determined surgery was unnecessary amounted to a disagreement regarding appropriate medical care and not deliberate indifference).

Accordingly, Plaintiff has not presented evidence showing the decision by Defendants Dr. Dean or NP Pasha not to alter or recommend alteration of his medication or make an urgent referral to a neurologist was taken in a conscious disregard of an excessive risk to his health, such that a "fairminded jury could return a verdict for him on the evidence presented." *Anderson*, 477 U.S. at 255.

In addition to failing to show his claims are more than a difference in medical opinion, Plaintiff also fails to show there is a genuine issue of material fact in dispute as to whether either Defendant actually drew an inference that there was an excessive risk to Plaintiff's health if they failed to change his medication. Even assuming that Plaintiff has presented evidence from which a jury could find that Defendants were aware of facts from which such an inference could be made, the evidence only supports a finding that Defendants did not actually draw that inference. *See Farmer*, 511 U.S. at 837 (holding that a prison official "must both be aware of the facts from which the inference could be drawn that substantial risk of serious harm exists, and he must also draw the inference"). The record evidence shows that Defendants addressed all of Plaintiff's documented and alleged side effects. In response to the Plaintiff's seizures, Dr. Dean continued his Keppra medication; she also ordered a blood test to determine the level of Keppra in his blood system. For his neuropathy pain, Dr. Dean increased his current dosage of Elavil. And for

his lower back pain, Dr. Dean provided Tylenol and ordered x-rays. She also ordered a future eye exam, noted physical therapy may be warranted, and made recommendations for improved overall health.

Based on these facts, the Court concludes Plaintiff has failed to make a showing sufficient to establish that Defendants were aware that their failure to change or recommend a change to his medication or refer him to a neurologist subjected him to a substantial risk of harm. *See Celotex Corp.*, 477 U.S. at 322.

Plaintiff's allegation that Dr. Dean laughed when he reported suicidal ideations caused by his medication, and that she told him: "Don't tell no one that, just do it," SAC at 8, does not create a material issue of fact. Although that allegation contradicts Defendant Dr. Dean's sworn affidavit, which states that she does not think he expressed suicidal thoughts to her because her standard practice is to record them in her notes and that she has "certainly never in [her] career told a patient expressing suicidal thoughts to 'just do it,' or any other words to that effect," Dr. Dean Decl. ¶ 6, the Court will not make a credibility determination in that regard. Nevertheless, this dispute does not raise a genuine issue of material fact. Even assuming a jury could find Plaintiff's version true, Defendant Dr. Dean's response—refusing to change his medication, recommend a change, or make an emergency referral to a neurologist—to Plaintiff's complaints that his medication was causing suicidal ideations and other side effects, was corroborated by the very doctors to whom Dr. Dean could have, at most, recommended a change in medication both before and after her decision.

Finally, even if there is a genuine issue of material fact in dispute as to whether Plaintiff informed Defendants that the side effects of his medication were life threateningly intolerable did, or should have, made them aware that he faced a substantial risk of serious harm without immediate action, Plaintiff has failed to raise a genuine issue of material fact as to whether Defendants' actions caused him harm. *See McGuckin*, 974 F.2d at 1060 (holding that with respect to claims of denial or delay of prison medical care, a plaintiff "can make no claim for deliberate medical indifference unless the denial was harmful.")

Plaintiff was on his medication for over two years before he allegedly asked Defendants for a change and continued on them for a year afterward.

The undisputed evidence, viewed in the light most favorable to Plaintiff, does not show that the short delay between his visits with Defendants in May and June 2014, and his visits with his primary care providers Dr. Chau and Dr. Malhotra in July and August 2014, neither of whom gave him the relief he requested from Defendants, caused him harm. He alleges he had gone back and forth between Neurontin and Keppra and Elavil in 2011 due to seizures while taking both types of medication, that he had been on Keppra and Elavil since early 2012, and that he requested a change in medication from Defendants over two years later in mid-2014. But he did not receive a change in medication until March 2015, nearly a year after his visits with Defendants, and did not receive the change in medication he wanted until he was prescribed Lyrica, a gabapentinoid in the same family as Neurontin in October 2015, and Neurontin in December 2015. In the interim, he alleges he continued to complain about his medication to other doctors and through prison grievances, but his course of treatment was repeatedly confirmed by his primary care doctors, including a neurologist who ordered a second EEG and a second MRI. The fact that it took Plaintiff nearly three years from 2012 to 2015 to have his medication changed back to what he wanted, does not support a finding that Defendants' refusal to make that change during a visit in mid-2014 caused him harm. Rather, the undisputed evidence shows Defendants' failure to immediately alter or recommend alteration of his medication or immediately refer him to a neurologist, if it caused him any harm, was, at most, an "isolated exception" to his "overall treatment," which "ordinarily militates against a finding of deliberate indifference." *Jett*, 439 F.3d at 1096.

That finding is further supported by Dr. Malhotra's statement on January 14, 2016. After Plaintiff had been returned to Neurontin, Dr. Malhotra stated that: "I see no indication for Neurontin." Feinberg Decl. at 8. Plaintiff's inmate grievances also support the finding. Plaintiff complained that his pain medication needed to be adjusted or he needed to be returned to Neurontin on July 26, 2014, shortly after his visits with Defendants; on

November 18, 2014, shortly after his visit with Dr. Chau; on December 18, 2014, shortly after his visit with Dr. Malhotra; as well as June 7, 2013, August 20, 2012, and September 26, 2012, before his visits with Defendants, none of which resulted in the change he requested. Opp'n at 136–47.

Plaintiff's allegation that his complaints are not documented in his UHR does not raise a genuine issue of material fact. Plaintiff had follow-up referrals to doctors, including neurologists, as well as an MRI and EEG, none of which resulted in the change of his medication until a year after he allegedly asked Defendants for a change. He was seen by Dr. Malhotra, a neurologist with the authority to change his medication, a few weeks after his visits with Defendants, and admits he told Dr. Malhotra about the side effects but he refused to change his medication. *See Farmer*, 511 U.S. at 844 ("Prison officials charged with deliberate indifference might show, for example . . . that they knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent.").

In sum, Plaintiff has not established the existence of a genuine issue of material fact from which a jury could find that Defendants Dr. Dean or NP Pasha knew of a significant risk to his health arising from his alleged complaints about his medication, that they drew such an inference, or that he suffered harm from their actions. At most, Plaintiff's claim rise to a difference in medical opinion which is not sufficient to raise a claim.

### B.    *Deliberate Indifference Claims Regarding Orthopedic Footwear*

Plaintiff alleges he told Defendants that a high percentage of his foot pain is reduced when wearing orthopedic shoes borrowed from other inmates and that he "was asking for [the] institution to prescribe [him] orthopedic shoes so [his] severe pain c[ould] be reduce[d] as how other similar[ly] situated inmates['] pain have been reduced after [the] institution has prescribed them orthopedic shoes." SAC at 6. He claims Defendants were

///
///
///

deliberately indifferent to his serious medical needs by failing to treat his foot pain, refer him to a podiatrist, or prescribe orthopedic shoes.[5]  *Id.* at 6, 8; Opp'n at 8.

Defendant Dr. Dean states that her notes of her May 21, 2014 visit with Plaintiff show he complained of a "needle" sensation in his feet, back pain, and numbness in his arms, but do not show a request for orthopedic shoes.  Dr. Dean Decl. ¶ 5.  She also states that Elavil is a medication commonly prescribed to treat diabetic neuropathy, that she raised the dosage of his prescription for Elavil from 25 to 50 mg in response to his complaint of neuropathic pain, and that it was medically appropriate to prescribe that level of Elavil at that time.  *Id.* ¶ 8.

Dr. Feinberg states there is nothing in Plaintiff's UHR to support his allegation he requested orthopedic shoes from Defendant Dr. Dean at their May 21, 2014 visit or from Defendant NP Pasha during their June 10, 2014 visit, but even if he did, it would not have been medically appropriate for either Defendant to provide them because: (1) the medical purpose of orthopedic shoes in persons with peripheral neuropathy is to decrease the chance of developing a foot ulcer; (2) Plaintiff has never been diagnosed with a foot ulcer or pre-ulcerative callus, has no history of partial or complete foot amputation or any type of foot deformity to predispose him to such ulcers, and is not documented as having a diminished blood supply to the foot that would place him at a risk for a foot ulcer; and (3) orthopedic

---

[5]  In responding to Defendants' arguments concerning orthopedic footwear, Plaintiff requests the Court treat as affidavits his verified Opposition (ECF No. 35) and verified Sur-Reply (ECF No. 40) to Defendants' prior Motion to Dismiss.  Opp'n at 11.  To the extent they contain allegations within his personal knowledge and function as admissible affidavits, the Court will consider them.  *See Connick v. Teachers Ins. & Annuity Ass'n*, 784 F.2d 1018, 1020 (9th Cir. 1986) (holding that the court shall consider all admissible affidavits and supplemental documents submitted on a motion for summary judgment); *Jones v. Blanas*, 393 F.3d 918, 923 (9th Cir. 2004) ("[B]ecause Jones is pro se, we must consider as evidence in his opposition to summary judgment all of Jones's contentions offered in motions and pleadings, where such contentions are based on personal knowledge and set forth facts that would be admissible in evidence, and where Jones attested under penalty of perjury that the contents of the motions or pleadings are true and correct.").  Both documents, however, merely repeat allegations in the SAC and his Opposition to the current Motion, with a single exception that he clarifies he told Defendant Dr. Dean that he knew of other inmates with diabetic neuropathy just like him who had been prescribed orthopedic shoes for their neuropathic foot pain.  ECF No. 40 at 3.

shoes are not intended or expected to reduce neuropathic pain. Dr. Feinberg Decl. ¶¶ 27–28.

Plaintiff replies that the Court is not permitted to weigh the credibility of the competing affidavits regarding whether he requested orthopedic shoes from Defendants, and repeated his request to appoint an expert "because only an expert on this issue can explain to the jury if orthopedic shoes can be use [sic] and prescribed to minimize neuropathic pain on feet although [there are] no signs of ulcers." Opp'n at 7–8.

Since there are competing affidavits regarding what Plaintiff told Defendants, and because the Court may not weigh evidence or make credibility determinations, the Court will assume a jury could find that Plaintiff informed Defendants he wanted orthopedic shoes because he knew of other inmates with his same medical condition who had been prescribed orthopedic shoes, he had tried other inmates' orthopedic shoes, and they were effective in reducing his foot pain. Plaintiff does not dispute that Defendant Dr. Dean doubled the dosage of his pain medication on May 20, 2014, in response to his complaint of foot pain. Although he generally contends Elavil was ineffective for his pain, he also does not dispute that his UHR indicates Elavil was undetectable in his blood at his follow-up visit with Dr. Chau on August 22, 2014. *See* Dr. Feinberg Decl. ¶ 20.

Based on these facts, the Court finds Plaintiff's claims regarding his request for orthopedic footwear amount to a disagreement regarding medical treatment for his foot pain. Plaintiff does not show that the doubling of the dosage of his pain medication in response to his complaint of foot pain, rather than a prescription for orthopedic shoes, amounted to the "unnecessary and wanton infliction of pain," or was "so totally without penological justification that it results in the gratuitous infliction of suffering." *Hoptowit*, 682 F.2d at 1246. Considering the evidence in the light most favorable to Plaintiff, there is no genuine issue of material fact in dispute whether Defendants were deliberately indifferent to his serious medical needs, because the evidence merely shows a disagreement between the type of medical treatment he received and the treatment he allegedly requested. ///

*See Jackson*, 90 F.3d at 332 (holding that a mere "difference of medical opinion" is "insufficient, as a matter of law, to establish deliberate indifference").

### C.    *Equal Protection Claims*

Finally, Plaintiff alleges the failure to prescribe him orthopedic shoes when other inmates with his condition were prescribed such shoes is a denial of "equal treatment," because: "I was not treated as how other similar situated individuals are treated."  SAC at 10–11.  Although it is unclear whether he is attempting to bring a claim under the Equal Protection Clause of the Fourteenth Amendment, it is clear he is unable to do so.

The Equal Protection Clause requires that persons who are similarly situated be treated alike.  *City of Cleburne, Tex. v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985).  "When an equal protection claim is premised on unique treatment rather than on a classification, the Supreme Court has described it as a 'class of one' claim."  *North Pacifica LLC v. City of Pacifica*, 526 F.3d 478, 486 (9th Cir. 2008) (quoting *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000)).  To establish a violation of equal protection in a class of one case, Plaintiff must establish Defendants "intentionally, and without rational basis, treated the plaintiff differently from others similarly situated."  *Id*.

Based on the undisputed evidence in this case, even if Plaintiff could present expert testimony that the prescription of orthopedic shoes was an acceptable treatment for his neuropathic foot pain, he cannot demonstrate there was no rational basis for Defendants to double his pain medication Elavil from 25 mg, the low end of its effective range for neuropathic pain, to 50 mg in response to his complaint of foot pain rather than prescribe orthopedic shoes.  This is particularly true because, if it turned out to be ineffective, he could have then predicated a renewed request for orthopedic shoes on the basis that doubling his pain medication was ineffective.  *See Willowbrook*, 528 U.S. at 564 (explaining that plaintiff must show "there is no rational basis for the difference in treatment.")

///

///

### D.    Qualified Immunity

Because the Court has found that no triable issue of fact exists to show Plaintiff's rights were violated, it will not address qualified immunity. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001) ("If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity."); *see also Pearson v. Callahan*, 555 U.S 223, 236 (2009) (holding that while the sequence in *Saucier*, while not mandatory, "is often appropriate").

## CONCLUSION

Based on the foregoing, Plaintiff's Motion for appointment of an expert (ECF No. 93) is **DENIED**; Plaintiff's Motion for an extension of time to oppose summary judgment (ECF No. 103) is **DENIED**; and Defendants' Motion for Summary Judgment (ECF No. 77) is **GRANTED**.

The Clerk of Court shall enter judgment accordingly.

**IT IS SO ORDERED.**

Dated:  August 6, 2019

Hon. Janis L. Sammartino
United States District Judge

15cv2247-JLS (JLB)